# EXHIBIT 1

FD-302 (Rev. 5-8-10)

- 1 of 7 -

### FEDERAL BUREAU OF INVESTIGATION


OFFICIAL RECORD


Government Exhibit
**226**
4:18-CR-368
4/4/2023 Hearing

Date of entry    07/29/2022

### PATIENT MEDICAL INFORMATION

This document contains patient medical information protected under the Privacy Act or the Health Insurance Portability and Accountability Act. Such information may be accessed and used only if necessary for the performance of one's official duties and only to persons with a need-to-know. This information must be safeguarded and protected from inadvertent disclosure.

On 7/20/22, LEONARD CARR, a white male, DOB 07/09/1966, was interviewed under a continuing proffer agreement at the US Attorney's Office in Houston, TX. Present at the interview was DOJ Prosecutor Aleza Remis, DOJ Prosecutor Katherine Raut, DOJ Prosecutor Devon Helfmeyer and TFO Sgt. Dino Vergara. After being reminded to be honest, CARR provided the following information:

*The following information is regarding documents provided to the government by CARR. They're Bates labeled CARR_00001 – 00240.*

**(CARR_000099)**

This document comes from the commission reporting system that was created by ERIC UNDERWOOD, basically showing BRIAN SWIENCINSKI's commissions per physician business.

SWIENCINSKI's commissions never went down, even if one of "his" doctors joined the "share program" (under Omni One Med / OOM), they were automatically set to 50%. Later in 2015, he raised it 60%.

If a rep had a doctor enrolled in the "share program" (OOM), the commissions from those scripts (adjusted to a somewhat less amount) would be added to a reps commission total from scripts out of another pharmacy. Ultimately, UNDERWOOD was able to combine these together into one system.

**BRIAN's Report October 2014 (CARR-000100-000104)**

Initially created by DAN MILOSEVIC.

This spread was SWIENCINCKI's "VIP LIST" of reps detailing the script (1st column); the pharmacy cost of the script (2nd column), and the amount of SWIENCINKSI's commission [50% of the pharmacies cost of the script, not the lesser reimbursement amount] (3rd column).

CARR realized in late 2016 these "reps" were actually patients who were also receiving commissions off of these scripts. This was also around the time, SWIENCINSKI texted CARR, telling him that "TERRY BRICKMAN's scripts got paid twice last month", basically acknowledging he was paying patients for their scripts.

"Q-Spine" **(CARR_000103)** was always on SWIENCINSKI's VIP list. BREIMEISTER and CARR never figured out who

---

Investigation on  07/20/2022  at  Houston, Texas, United States (In Person)

File # 209A-HO-2097214                                                     Date drafted  07/27/2022

by  VERGARA DINO ALEXIS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

209A-HO-2097214

(U) Carr, Leonard - 22-07-20 - Proffer

Continuation of FD-302 of  interview _____ , On  07/20/2022 , Page  2 of 7

"Q-Spine" was.

### 12/14/15 Meeting in Vegas (CARR_000106-000107)

BREIMEISTER and SWIENCINSKI were attending a pharmacy tech convention and decided to fly CARR down to have this shareholder meeting. Meeting took place in CARR's hotel room.

SWIENCINSKI believed the only way they could continue getting business was to come up with another "share vehicle" (for doctors) out of ACCUCARE PHARMACY, OOM was done by this time. A PPM was drafted, calling for a management agreement between PHARMS LLC and ACCUCARE. The "BAA" was a Business Associates Addendum that would be added to agreement allowing ACCUCARE to share patient information between each other (HIPPA agreement). BREIMEISTER and CARR thought this was a bad idea. DOJ was cracking down on pharmacies so "they" felt the only way to keep business going was to have a non-physician owned pharmacy and W2 reps. This is when they decided to turn to Medicare business, knowing that Medicare did not allow physician owned pharmacies.

The last "big" PBM contract at Omni Plus Pharmacy (OPP) was with CVS Caremark.

Discussed buying a new pharmacy but move into the OPP location.

Once the CVS Caremark contract terminated with OMNI ONE MED and PHARMACY (OOMP), it was considered "crippled", or no longer having major contracts.

At the time, pharmacy costs were not directly tied to the cost of the drugs or the pharmacy overhead. Those expenditures were not included in the calculation of the commissions. BREIMIESTER wanted to include those expenditures to reduce commissions.

KEVIN ALVERSON is one of SWIENCINSKI's friends from MEDTRONIC. ALVERSON visited the Houston office once. SWIENCINSKI wanted to make him Director of Marketing. This never happened but "they" made some payments to him to cover his travel costs. ALVERSON and his family members received scripts.

Owner's base salaries were changed. SWEINCINSKI was going to get $50k a month and continue to receive commissions from his VIP list. BREIMEISTER was going to get $40K a month. CARR's salary was yet to be determined, instead, he asked for more ownership, and it went from 5% to 20% ownership.

At the time, SWIENCINSKI believed "they" were going to win the ESI countersuit, therefore, since "he" did all the work, "he" would give himself 20% of the winnings. *(SWEINCINKSI believed the ESI lawsuit was going to be over a contract dispute, but "they" found out, during the trial, that ESI had discovered reps were getting scripts for their family members).*

### Management Meeting 5/6/15 (CARR_000110-000113)

Purpose of this meeting was to say, "Hey we need Medicare scripts."

SWIENCINSKI made it clear that all he had to do was call his doctors (REDKO, RANDAWHA, SALVATO, and INCE) and they would start writing those Medicare scripts.

"Patient harvesting" was an idea to identify "pain" patients (who had unfilled scripts not covered by their insurance) and find another pain medication that may be covered. "They" would go back to the prescribing doctor to see if he would allow the pharmacy to try this "other" medication to see if it would pay. The focus of the "harvesting program" was not for the benefit or health of the patient but instead "it was for revenue." DR's VIESCA and BABUS were SWIENCINSKI doctors who agreed to this.

GEX226.002

FD-302a (Rev. 5-8-10)

209A-HO-2097214

(U) Carr, Leonard - 22-07-20 - Proffer

Continuation of FD-302 of interview ,On 07/20/2022 ,Page 3 of 7

UNDERWOOD may have written a program to sort these "harvester" patients from the "compounder" database.

"Super SB" was a formula of a cream from capsules. This cream was "test billed" by PAM BAILEY. The cream was created by the PIC and BREIMEISTER, thus why it was called "SUPER SB." BREIMEISTER would put his name on compounds he created (Super SB, Scott Cream, etc).

Discussion was that "if it's a government script, we have to collect copays."

(CARR_000114-000116)

Written by BAILEY and distributed to the pharmacy techs. Even though it was on paper, this was not the standard practice.

Meeting 4/21/15 (CARR_000117-000119)

RICK MAYABB is one of SWIENCINSKI's friends from MEDTRONIC. MAYABB wanted help on a business deal, "they" didn't do anything on it.

Meeting 11/15/16 (CARR_000120)

This meeting with SWEINCINSKI and BREIMEISTER was close to the time the pharmacy was about to close.

PALMER, BRIGHAM, and MARK C. were the three biggest reps who wanted more money. SWIENCINSKI agreed if they did $750k in sales, their commission rate would go up to 60%, if $1 million it would go up 66%.

Revenue was decreasing. All that was paying out was Voltaren, Dicoflenac, and Lidocaine, and pharmacies were starting to cut that. No other products were coming. SWIENCINKSI knew by this time the business was going to be shutting down. "They" decided to close pharmacies and downsize staff by January 2017, but instead, they closed everything on January 15, 2017.

When the business shut down, SWIENCINSKI wanted to continue with one pharmacy, BREIMEISTER was not interested.

They still had a viable pharmacy in ONE STOP PHARMACY (JERMAINE WIGGINS' pharmacy) and it was moved into the space that once was OOM. There was a discussion to sell this pharmacy. Eventually ONE STOP was sold to SWIENCINSKI who quickly sold it to NICOLE BEZETTA and TED BLANCHARD.

**ONE STOP PHARMACY**

ONE STOP purchase was around the time when REDKO, MILOSEVIC, and BREIMEISTER were trying to conceal their ownership of all the pharmacies. BREIMEISTER found One Stop and proposed to buy a minority ownership (49%) of the pharmacy and leave WIGGINS as the majority owner, with the understanding they would buy the other half at a later date. BREIMEISTER believed this being easier than implementing the employee straw ownership idea.

As far as the purchase of ONE STOP, WIGGINS was paid $160k for the pharmacy and then a $2K stipend to keep him on as majority owner in name only. BREIMEISTER owned the LLC that ONE STOP was under but had a minority stake in the pharmacy. WIGGINS had no part in the day to day.

FD-302a (Rev. 5-8-10)

209A-HO-2097214

Continuation of FD-302 of (U) Carr, Leonard - 22-07-20 - Proffer interview ,On 07/20/2022 ,Page 4 of 7

### Meeting 9/15/16 (CARR_000121-000122)

Minutes of this meeting were being written by AKHILA KATRAGADDA. Everybody at PHARMS was in this meeting discussing how to fix the "donut hole" problem.

KALEO (pharmaceutical company) only allowed certain doctors to write on their scripts. KALEO was not used to dealing with pharmacies but instead with large wholesalers. PHARMS' pitch to them was they could increase their business without taking away business from their other distributors.

### Meeting 5/12/16 (CARR_000124)

TOMMY PALMER told SWIENCINSKI that he needed to purchase a pharmacy for the structure of his physician owned management services organization (MSO). "They" spoke to PHARMS accountant, BARRY LEVINE about selling PALMER a pharmacy but nothing ever came of it.

### Management Meeting 5/11/16 (CARR_000125)

Formula changes to Medicare scripts.

### Email from PAM BAILEY 8/27/15 (CARR_000128-000143)

BRAD MADRID would usually send this to PAM BAILEY. The names in bold are reps and their patents.

One of the first times names of patients were included in a report.

### (CARR_000141)

This was BAILEY running people from SWIENCINSKI VIP list to see if their insurances paid on new products.

### EMAIL November 18 & 19, 2015 (CARR_000144-000146)

CARR saying this should be done by a doctor.

### EMAIL 7/11/16 (CARR_000149-000150)

BRANCO MILSOEVIC was still at the pharmacy as a consultant. The attachment is one of ESI spreadsheets used in the trial.

### EMAIL 2/27/15 (CARR_000167-000170)

CARR didn't know who JAMES BUCKINGHAM was at the time.

He only knew that patients were beginning to receive letters from ESI.

It looks like the patient received the ESI letter, than forwarded to the rep, the rep would forward to SWIENCINSKI, and then forwarded to "us."

GEX226.004

FD-302a (Rev. 5-8-10)

209A-HO-2097214

(U) Carr, Leonard - 22-07-20 - Proffer

Continuation of FD-302 of  interview _____, On  07/20/2022 , Page  5 of 7

**EMAIL 8/17/15 (CARR_000171-175)**

SiliPak is a single NDC product possibly for scars. BAILEY is the one who ran test claims on this request.

**EMAIL 8/27/15 (CARR_000176-000182)**

By this time, they were trying to bill anything that paid.

**EMAIL 1/4/16 (CARR_000182)**

"Whack a Mole" comment was in regard to the PBM's cancelling contracts causing them to constantly moving their scripts around or buy new pharmacies.

SWIENCISKI included an analysis of the business for everyone to see.

SWIENCINSKI pointing out that Medicare is the "volume business."

**EMAIL 4/19/16 (CARR_000183)**

This is a list of SWIENCINSKI's people.

DAVE KOSLOSKY was a rep getting paid by SWIENCINKSI for a business they had but then wanted the pharmacy to pay.

Avalon Medical was also a rep.

**EMAIL 11/1/16 (CARR_000184)**

Discussion of BRICKMAN getting paid twice. *(CARR stated that he has a text from SWIENCINSKI saying that he paid BRICKMAN twice on some scripts)*

**Email 8/26/16 (CARR_000185)**

BREIMEISTER getting tired of SWIENCINSKI getting paid so much money on the VIP list.

**EMAIL 8/27/25 (CARR_000187-000188)**

SWIENCINSKI asking BAILEY to test run a cream on the following VIP customer's insurance providers.

**Screenshots (CARR_000237-000239)**

Screenshots from SWIENCINSKI's bank account.

PHARMS had an audit that was requesting justification on ingredients that were purchased. According to BRONCO, "they" had purchased these ingredients from a pharmacy that was going out of business.

SWIENCINSKI made the payment for these bulk ingredients. CARR needed documentation of that payment for

FD-302a (Rev. 5-8-10)

209A-HO-2097214

Continuation of FD-302 of (U) Carr, Leonard -- 22-07-20 -- Proffer interview , On 07/20/2022 , Page 6 of 7

the audit so he reached out to SWIENCINSKI. SWIENCINSKI said "I'll look it up". He texted CARR saying, "it was on the text but don't pay attention to the other things on there." CARR noticed all the INCE outgoing transfer amounts.

CARR went to BREIMEISTER about what he saw. BREIMEISTER stated "that BRIAN has invested in INCE's business and has been loaning him money."

**Timeline:**

After January 2015:

- Compounds tapered off.

January 2015 to July 2015:

- They went to dispensing kits (compounds in a box)

April 2015:

- Dispensing patches.
- Pain patches applied to the body (Lidocaine), no mixing.

May 2015 to close of business:

- Dispensing Medicare paid products (Remi-D).
- SWIENCINSKI's idea. He was still getting sizeable commissions off Medicare products as a QMED rep. He said that even though Medicare did not pay as much per product, the adjudication (approval) rate was over 90%. Big volume equaled a decent business.
- Dispensing medical grade Lidocaine and Voltaren in tubes.
- PHARMS still had a pharmacy owned business (OOM).

June 2015:

- There was a rush to buy out the physicians from the share program so they could dispense Medicare products out of OOM.
- The physician buyout payments and its documents were backdated to May 31, 2015.
- BREIMEISTER would have handled all the buyouts between the doctors. DIETER would have handled the payments to them.
- Dr. NASH wanted to join the share program. "They" accepted his payment for the program and then bought him out, backdating the check for May 31.

**OTHER**

Evsio was known as a specialty drug that paid high dollar amounts. BREIMIESTER started specialty to diversify from compounds.

When MILOSEVIC paid commission to SWIENCINKSI, check was made out to WORTH MEDICAL. When CARR took over, SWIENCINKSI instructed to pay him directly. This lasted a few months and was changed back to WORTH, reason being was that he was paying too much on franchise taxes.

Until mid-2016, outstanding copays were not initially included in accounts receivable.

GEX226.006

FD-302a (Rev. 5-8-10)

209A-HO-2097214

Continuation of FD-302 of interview (U) Carr, Leonard - 22-07-20 - Proffer , On 07/20/2022 , Page 7 of 7

GEX226.007